IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| Health and Body Store, LLC and HotHeadz International, Inc., | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | No. 11-cv-6638 |
| v. | : | |
| JustBrand Limited, Justin Silverman, and Brandon Singer, | : | |
| Defendants. | : | |

**Goldberg, J.**                                                                 September 11, 2012

**Memorandum Opinion**

Currently before the Court is the motion for a preliminary injunction filed by Plaintiffs HotHeadz International, Inc. ("HotHeadz") and Health and Body Store, LLC ("HBS"). Plaintiffs seek an order precluding Defendants Justin Silverman and Brandon Singer from independently operating two websites (the Websites) that Defendants had developed, and which the parties had previously used to conduct an Internet business. Specifically, Plaintiffs seek an Order giving "control of the two Websites back to the commonly owned company, Health and Body Store, LLC." (N.T. 11/3/2011, p. 7.)

Following a preliminary injunction hearing held on November 3-4, 2011, we denied Plaintiffs' motion, finding that Plaintiffs had failed to show a likelihood of success on the merits. (Doc. No. 17.) Our ruling was premised upon the undisputed fact that the parties never consummated an operating agreement regarding the essential terms of a joint venture. Based upon the absence of an agreement, we found that no relationship existed between the parties that would be sufficient to give rise to a fiduciary duty. We further concluded that, because the unsuccessful

1

negotiations regarding a potential operating agreement primarily concerned the transfer of the Websites at issue, Plaintiffs had failed to establish a likelihood that they were entitled to control of the Websites.

The United States Court of Appeals for the Third Circuit vacated this ruling, finding that Defendant JustBrand, Ltd. ("JustBrand"), a limited liability company owned by Defendants Silverman and Singer, had jointly formed HBS with Plaintiff, HotHeadz. The Third Circuit thus found that Defendant JustBrand owed a fiduciary duty to Plaintiffs HotHeadz and HBS. Health and Body Store, LLC v. JustBrand Ltd., No. 11-4132 (3d Cir. May 11, 2012). This ruling was premised on the fact that HBS had filed a certificate of organization with the Commonwealth of Pennsylvania, that Silverman acknowledged that JustBrand was formed to hold their interest in HBS, and that certain tax documents reflect JustBrand's membership in HBS. Id., slip op. at 13-14. The case was remanded for our consideration as to whether Defendants breached their fiduciary duties by excluding HotHeadz and HBS from the Websites, and whether injunctive relief was therefore necessary.

After further consideration of this matter, we conclude that Defendants likely breached their fiduciary duties by excluding HotHeadz from access to the Websites, and that irreparable harm would likely result from this continued exclusion. We thus find that return of the Websites to HBS is necessary to preserve the status quo pending final resolution of this case. However, given the absence of an operating agreement governing the partners' rights and obligations, and the dissension between the parties, the Court finds it necessary to appoint an Interim Receiver to settle disputes which may arise regarding the management of the business, pending final resolution of this matter.

**I.      Background**

Although much of the necessary factual background is set forth in the Third Circuit's May 11, 2012 Opinion, and this Court's ruling issued from the bench on November 8, 2011, several facts are worth highlighting.

Defendants Singer and Silverman, while employed by HotHeadz, began operating the Websites as a side business in 2007. At that time, HotHeadz was managed by Singer's father, Bruce Singer, and Defendants operated this side business with the full knowledge and consent of HotHeadz management. (N.T. 11/3/2011, pp. 30, 34-35.) Indeed, HotHeadz sold Defendants the majority of the products they used in their Internet business. (N.T. 11/4/2011, p. 96.) Silverman registered the domain names www.healthandbodystore.com and www.thewarmingstore.com ("Domain Names"), and he and Singer began operating online stores selling winter apparel and health products. (Id., pp. 94-96.) The Defendants operated the Websites on their own, and expended significant effort to develop these Websites. Defendants independently created and managed content, paid for strategic online advertising, processed orders, shipped goods, and handled customer service. (Id., pp. 94-96, 138-143.)

In March 2008, Jeffery Zelenko, who had known Bruce Singer since childhood and was Defendant Singer's godfather, took over as Chief Executive Officer of HotHeadz. (N.T. 11/3/2011, pp. 32-34.) Zelenko testified that he initially allowed Defendants' side business to continue, but, as part of an effort to "change the culture of the company," he intended to discuss the situation with Defendants. (Id., pp. 30-39.) Towards the end of 2008, Zelenko approached Defendants and told them that they could either leave HotHeadz and run the Websites on their own, or "work out some sort of a deal" to operate the Websites jointly with HotHeadz. (Id., p. 40.) Defendants chose the latter option, and began preliminary discussions regarding a joint venture.

In 2009, HotHeadz's management drafted, and sent to Defendants, two versions of a "Letter of intent to form [a] Partnership for Internet Division Between [HotHeadz] and Brandon Singer and Justin Silverman" (collectively "Letters of Intent"). (Def. Tr. Br. Ex. 5.) The Letters of Intent acknowledged Defendants' ownership of the Websites, and provided for their transfer to the partnership for "no financial consideration." (Id.) Defendants never signed the Letters of Intent or agreed to their terms.

Nonetheless, Defendants began operating the website business together with HotHeadz in the latter part of 2009. (N.T. 11/4/2011, p. 54.) In January 2010, through the filing of a certificate of organization, HotHeadz formed HBS as a limited liability company to operate the Internet business with the Defendants. (Id., p. 103.) Although there was still no operating agreement between the parties, and no certificate of ownership interest was ever filed, Defendants and HotHeadz operated the website business through HBS from early 2010 until October 2011. During that time, the Domain Names remained registered to Silverman, and revenue from the Websites was deposited into a bank account registered by HBS and accessible only to HotHeadz. (N.T. 11/3/2011, pp. 152-153.) Defendants continued to manage the content, layout and advertising of the Websites, and HotHeadz shipped customer orders from its warehouse, including HotHeadz products which it sold to HBS at cost. HotHeadz also provided its existing employees, part-time, to handle customer service and accounting for the business. (N.T. 11/3/2011, pp. 160-66; N.T. 11/4/2011, pp. 159, 182; Donato Decl. ¶ 22, Pl. Tr. Br. Ex. 1.)

Sometime in August 2011, HotHeadz, through its Chief Operating Officer, Charles Donato, informed the Defendants that it intended to charge HBS "management fees" for its contribution to the joint partnership. (N.T. 11/4/2011, pp. 158-59, 180-82.) Specifically, HotHeadz planned to

4

charge HBS $240,000 for 2010, and $360,000 for 2011. (Id.) These amounts were unilaterally selected by HotHeadz without any input from its partners, and the "management fee" amount of $240,000 for 2010 was selected even though total revenue from the Websites for 2010 totaled only $358,000. No itemized basis for these charges was ever provided to Defendants by HotHeadz. (Id.)

Around the same time, HotHeadz drafted an operating agreement. Donato testified that he gave Silverman the draft agreement for review, but never received any response. (N.T. 11/3/2011, pp. 184.) Silverman denied ever seeing the draft agreement, and testified that Donato told him the agreement was "one-sided" and would include a dilution clause.[1] (N.T. 11/4/2011, p. 157.) Donato did not dispute this, and testified that he told Defendants that they might find the proposed operating agreement to be "somewhat one-sided." (N.T. 11/3/2011, p. 189.) According to Silverman, Donato also requested that the Domain Names be transferred to HBS prior to finalizing the operating agreement. (Id., pp. 154-155.)

The Domain Names were never transferred, and the operating agreement was never signed. (N.T. 11/3/2011, pp. 130-133.) Because of the exorbitant management fees proposed by HotHeadz, what they understood to be a "one sided" draft operating agreement, and HotHeadz's insistence that the Domain Names be transferred without any formal operating agreement, Defendants lost trust in their business partner and began planning to leave HotHeadz and operate the Websites independently.[2] (See N.T. 11/4/2011, pp. 128, 164.) Defendants purchased inventory on their

---

[1] Silverman explained that he understood that the dilution clause would allow one partner to dilute the ownership shares of the other partner through the infusion of cash. (N.T. 11/4/2011, p. 157.)

[2] Defendants' allegations that HotHeadz charged exorbitant and unjustified management fees, excluded Defendants from accessing the revenue generated from the Websites, and failed to distribute profits generated by the business are the bases for Defendants' counterclaims of fraud,

personal credit, had it shipped directly to Silverman's home, and began making arrangements with vendors other than HotHeadz for inventory purposes. On October 11, 2011, Defendants resigned, and changed the passwords associated with the Websites and the accounts used to collect payments from customers. (See id., pp. 75-82.) Since that time, Defendants have operated the Websites independently. Defendants assert that since resigning they have changed the design and content of the Websites, and have removed all of HotHeadz's trademarks. HotHeadz maintains, however, that the appearance of the Websites is identical to its appearance prior to October 11, 2011.

Plaintiffs commenced this action on October 24, 2011, asserting claims under the Lanham Act, 15 U.S.C. § 1051, violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, and various common law claims, including breach of fiduciary duty, misappropriation of trade secrets and confidential information, unfair competition, tortious interference with contract, and conversion. (Compl., Doc. No. 1.) Plaintiffs subsequently amended their complaint to add claims of dilution under 15 U.S.C. § 1125, statutory misappropriation of trade secrets under 12 Pa.C.S.A. § 5301, et seq, and additional common law claims. (Am. Compl., Doc. No. 44.) Defendants filed counterclaims against Plaintiffs for fraud, breach of fiduciary duty, and related claims. (Doc. No. 49.) At this stage of the litigation—the preliminary injunction phase—Plaintiffs seek an order precluding Defendants from operating the Websites independently, and seek return of control over the Websites to HBS.

## II. Legal Standard

"A preliminary injunction is an extraordinary remedy never awarded as of right." Winter v. Natural Resources Defense Council, Inc., 555 U.S. 7, 24 (2008). In determining whether such an

---

breach of fiduciary duty, conversion and unjust enrichment. (Am. Countercl., Doc. No. 49.)

extraordinary remedy is appropriate, a district court must consider: (1) whether the movant has made a strong showing that it is likely to prevail on the merits; (2) whether the movant has shown that, without such relief, irreparable injury is likely to occur; (3) the potential harm to the non-moving party should injunctive relief be imposed; and (4) the public interest. Klitzman, Klitzman and Gallagher v. Krut, 744 F.2d 955, 958-59 (3d Cir. 1984).

### III. Discussion

The Third Circuit has determined that the Websites were part of a joint venture between Defendants and HotHeadz and that a fiduciary duty exists between the parties. Because HBS' certificate of organization did not contain a statement that it "shall be managed by managers," Pennsylvania partnership law governs the relationship and duties between the parties. See 15 Pa.C.S. § 8904.

As noted by the Third Circuit, partners, as agents of the partnership, owe a duty of loyalty to their partners and to the joint business. Specifically, both partners are obligated to act "with the utmost good faith in furtherance and advancement of the interests" of the partnership. McDermott v. Party City Corp., 11 F. Supp. 2d 612, 627 (E.D. Pa. 1998) (quoting Garbish v. Malvern Fed. Sav. & Loan Ass'n., 517 A.2d 547, 553-54 (Pa. Super. 1986)).

Here, Defendants have excluded Plaintiffs from access to the Websites, which are the primary source of income for HBS. Defendants are also diverting revenue to an account which they exclusively control. Under these circumstances, although no terms regarding the partnership have ever been reached, Plaintiffs have made a strong showing that at trial they are likely to establish Defendants' breach of their fiduciary duty of loyalty. See Clement v. Clement, 260 A.2d 728, 729 (Pa. 1970) (self-dealing and diversion of partnership funds constitutes a breach of fiduciary duty);

cf. 15 Pa.C.S. § 8331(5) ("All partners have equal rights in the management and conduct of the partnership business.").

We also conclude that Plaintiffs have made a strong showing that Defendants' exclusion of Plaintiffs from the Websites has likely resulted in irreparable harm, which may continue unless injunctive relief is granted. "Grounds for irreparable injury include loss of control of reputation, loss of trade and loss of goodwill." S&R Corp. v. Jiffy Lube Intern., Inc., 968 F.2d 371, 378 (3d Cir. 1992) (citing Opticians Ass'n of America v. Independent Opticians of America, 920 F.2d 187, 195 (3d Cir. 1990)).  By converting the Websites to their own use, Defendants have created a situation where the partnership has no ability to maintain the reputation, trade and goodwill of the business. This injury is not fully compensable by money damages. See Pierre & Carlo, Inc. v. Premier Salons, Inc., 713 F. Supp. 2d 471, 481 (E.D. Pa. 2010) (citing Kos Pharm., Inc. v. Andrx Corp., 369 F.3d 700, 726 (3d Cir. 2004)).

We thus conclude that Plaintiffs have established the first two elements necessary for injunctive relief. However, we must also consider the potential harm to Defendants. Krut, 744 F.2d at 958-59. The appropriateness of injunctive relief, and the scope of that relief, depends upon a balancing of the hardships to the respective parties. Opticians, 920 F.2d at 197-98.[3]

If Defendants were excluded from control over the Websites which they conceptualized and developed, the potential harm to them would be at least as great as the present harm to Plaintiffs. Indeed, there are compelling reasons to believe this may occur if the Websites are turned over to HBS. HotHeadz has insisted that it owns 75% of the joint venture. (See, e.g., Pl. Tr. Br., p. 8.)

---

[3] We do not consider the public interest to weigh heavily in favor of, or against, injunctive relief.

HotHeadz continues to press this point despite the absence of an operating or partnership agreement, and despite Zelenko's testimony that "there was never a finalized agreement" with regard to the terms of the partnership. (N.T. 11/3/2011, p. 120.) Thus, it is not hard to imagine that the hardship HotHeadz complains of—a lack of control over the Websites—would similarly occur to Defendants if the Websites were ordered under the control of HBS. Put another way, the "fiduciary duty" concept flows both ways. The only arrangement which appropriately balances the interests of the parties is to provide JustBrand and HotHeadz with equal right to access and manage the Websites in accordance with the obligations and duties attendant a partnership relationship. Such injunctive relief is necessary to "maintain the status quo," defined as the last "peaceable, noncontested status of the parties." Opticians, 920 F.2d at 197.

In balancing the hardships to the parties, we also recognize that depriving Defendants of the exclusive use of the Domain Names to which they may presently have title could cause them hardship, but this situation has been brought about, in part, as a result of their own conduct. See Opticians, 920 F.2d at 197 (a party "can hardly claim to be harmed, since it brought any and all difficulties occasioned by the issuance of an injunction upon itself.") The temporary infringement of Defendants' claimed property right in the Domain Names does not outweigh the harm to Plaintiffs of being excluded from access to the central asset of the joint venture. In short, balancing the parties' interests and potential hardships requires that neither party have the right to exclude the other from any part of the business, including the Websites, bank accounts, vendor lists, and other proprietary information of the business. Under normal circumstances, the Court would leave it to the parties to effectuate and maintain the business in this fashion through the remainder of this litigation. However, given the current toxic relationship between the parties, directing them to

interact for the betterment of HBS while this litigation continues raises serious concerns.

Although this case is only in its preliminary stages, it is clear that there is significant animosity between the parties. Personal and familial issues underlie the parties' business relationship dating back to Zelenko's childhood relationship with Bruce Singer, and his assumption of control of HotHeadz. Defendants testified that they believed Zelenko had purposefully diluted Bruce Singer's shares in order to force him out of the business, and that he intended to do the same to them regarding the Websites. (N.T. 11/4/2011, p. 164.) Defendants explained that the reason for their eventual resignation was their distrust of HotHeadz's management, and their belief that Zelenko and Donato planned to use exorbitant management fees and a dilution clause to eventually exclude them from the business. For their part, Defendants undoubtedly caused severe damage to their relationship with HotHeadz by suddenly resigning and excluding Plaintiffs from access to the Websites. The hostility and distrust between the parties has likely only been deepened by the contentious litigation that has ensued.

The conflict between the parties is even more disconcerting given the absence of an agreement governing their respective rights and obligations. Basic issues such as management of the Websites, inventory and revenue, profit distributions and management fees have not been resolved. Indeed, as noted above, even the ownership interests of the respective parties is hotly disputed. HotHeadz, relying upon the Schedule K-1's issued by HBS, asserts that it owns a 75% interest in the joint venture. (See Pl. Tr. Br., p. 8, citing Exs. X, V, Doc. No. 57-4.) However, Plaintiffs generated these tax documents without any input from Defendants, who explained that they incorporated them into their individual tax returns only in order to avoid penalties for filing late returns, and with the intent to amend these returns. (N.T. 11/4/2012, pp. 58-89, 65.) Defendants

strongly insist there was never a meeting of the minds or any type of agreement with Plaintiffs regarding ownership of HBS or the Websites.

It is also worth noting that the Pennsylvania Enterprise Registration Form filed by HBS reflects that HotHeadz and Defendants each have a 50% ownership interest in the partnership. (Pl. Tr. Br. Ex. Z.) Indeed, the Third Circuit has noted that the "precise ownership interest of each party is unclear." See Health and Body Store, slip op. at n. 5. HotHeadz's continued insistence that it is the majority owner of HBS, despite the absence of a formal agreement, causes concern about their intent to provide Defendants with an equal right to manage the business upon return of the Websites to the partnership.[4] Unfortunately, it appears that this issue will have to be resolved through a trial which will not occur in the immediate future.[5]

The circumstances described raise a substantial concern that the parties will be unable to work cooperatively, and that the joint venture will suffer severely as a result. Accordingly, we conclude that the appointment of an Interim Receiver who will resolve business disputes that arise between the parties pending resolution of this litigation. Our decision to appoint an Interim Receiver is not made lightly. Because of the effect such an appointment may have on a business, the decision to do so is made "with caution and circumspection, and only in an extreme case under extraordinary circumstances." Hankin v. Hankin, 493 A.2d 675, 677 (Pa. 1985). Nonetheless, "[i]t is well settled

---

[4] We note that even if HotHeadz has a 75% ownership interest in the partnership, that does not necessarily mean that HotHeadz has a controlling interest in the management of the joint enterprise. Indeed, in the absence of an agreement to the contrary, general partners are entitled to "equal rights in the management and conduct of the partnership business," regardless of their relative contribution or entitlement to profits. 15 Pa.C.S.A. § 8331(5).

[5] We also note that extensive attempts to settle this matter by both this Court and Magistrate Judge L. Felipe Restrepo were entirely unsuccessful.

that the appointment of a receiver is within the inherent equitable powers of a federal court." Berger v. Weinstein, 2008 WL 191172, at * 12 (E.D. Pa. Jan. 23, 2008) (citing Tanzer v. Huffines, 408 F.2d 42, 43 (3d Cir. 1969)). A receiver is necessary where there is "imminent danger of property being lost, injured, diminished in value, or squandered," and no adequate remedy at law exists. Mintzer v. Arthur L. Wright & Co., 263 F.2d 823, 826 (3d Cir. 1959).

The circumstances in this case are sufficiently extreme to warrant appointment of an Interim Receiver. There is no remedy at law that will adequately compensate either party for the loss of goodwill and reputation that could result from mismanagement of the business. Joint management of the Websites by HotHeadz and the Defendants without an effective method in place to settle disagreements would create a significant danger that the assets of the business would be squandered or diminished in value as a result of the personal animosity between the parties. As there is no operating agreement to provide a structure for resolving disagreements, and the structure of the partnership is entirely unclear at this stage, an Interim Receiver is necessary to protect the business's assets. In order to avoid unnecessary infringement upon the parties' property interests in the business, the receiver's role will be limited to advising the parties regarding disputes over management of the business, and resolving those disputes should the parties reach an impasse.[6]

---

[6] We note that the same circumstances which make it necessary to appoint an Interim Receiver raise significant concern as to whether the partnership will survive this litigation. Indeed, Defendants' exclusion of HotHeadz from the joint venture is by itself grounds for dissolution. In re Woskob, 305 F.3d 177, 183 (3d Cir. 2002). It appears inevitable that this joint venture will not endure, and that the parties will ultimately part ways. Should that be the case, the assets of the partnership will either be divided pursuant to an agreement between the parties, or it may be that the joint venture will be wound up, and the partnership's assets liquidated. It seems apparent to the Court that the prudent approach would be for the parties to reach an agreeable end to their joint venture now rather than find themselves in a similar position after having endured the cost of protracted litigation and the burden that their dissension and a receiver will likely place upon the business.

**IV.     Conclusion**

As set forth above, injunctive relief is appropriate. Control of the Websites will be returned to HBS, and shared equally between Defendants and HotHeadz. The parties are obligated to act in the best interest of the joint business, and in accordance with all fiduciary duties that arise from their partnership relationship. Additionally, given the dissension between the parties, and the uncertainty regarding their rights and obligations in managing the business, an Interim Receiver will be appointed to assist the parties in resolving any business disputes which might arise, and to decide those disputes the parties are unable to resolve.